**Beveraly BURACZYNSKI and Stanley Parker, Plaintiffs/Appellants,**

v.

**Edward J. EYRING, M.D. et al., Defendants/Appellees.**

**Carolyn BRIDGES, Plaintiff/Appellant,**

v.

**Edward J. EYRING, M.D. et al., Defendants/Appellees.**

Supreme Court of Tennessee.

April 1, 1996.

---

J. Mikel Dixon, Knoxville, for Appellants.

Alan M. Parker, Lewis, King, Krieg, Waldrop & Catron P.C., Knoxville, for Appellees.

## OPINION

ANDERSON, Chief Justice.

In this consolidated appeal, we are asked to decide whether an agreement between a physician and a patient to submit to arbitration "any existing or thereafter arising controversy" is applicable to a medical malpractice dispute and enforceable under the Tennessee Arbitration Act.

The trial court denied the physician's motions to compel arbitration in each of two separate medical malpractice actions on the grounds that the agreements were not subject to the arbitration statute, and that the agreements were not enforceable contracts because they lacked consideration. The Court of Appeals reversed, deciding that the Tennessee Arbitration Act applies to arbitration agreements between physicians and patients and that these specific agreements were supported by consideration.

We conclude that arbitration agreements between physicians and patients are not void as against public policy, and are therefore enforceable under the Tennessee Arbitration Act. We caution, however, that such agreements may constitute contracts of adhesion which must be closely scrutinized to determine if unconscionable or oppressive terms are imposed upon the patient which prevent enforcement of the agreement. The arbitration agreements in this case, though contracts of adhesion, contain no unconscionable or oppressive terms and are therefore enforceable. Accordingly, the Court of Appeals' judgment is affirmed.

## BACKGROUND

Two medical malpractice actions have been consolidated for appeal because the legal issues are identical. The factual background of each case follows.

### Bridges

On September 11, 1990, Edward J. Eyring performed a right total knee replacement on Carolyn Bridges with his assistant, Becky Phillips, attending. A little over two months later, Bridges voluntarily signed a "Physician–Patient Arbitration Agreement" with Eyring. At the time of signing, she also initialed a provision in the agreement making it "effective as of the date of first medical services." The agreement, therefore, was retroactive to medical services rendered before the date of the agreement, including the September knee replacement surgery.

Bridges' complaint for medical malpractice against Eyring and Phillips alleges that not long after she signed the agreement, she began having trouble with the artificial knee joint. It became loose and unstable, making ambulation difficult and interfering with her ability to carry out her employment duties. She says she consulted another orthopedic surgeon who informed her that the prosthesis had been improperly applied, resulting in instability and pain. Because of her problems, Bridges was required to undergo a second knee replacement surgery, during which the original joint was replaced by another less durable type of prosthesis.

### Buraczynski–Parker

Beverly Buraczynski and Stanley Parker are the children of Helen R. Parker, who, for a number of years, was a patient of Eyring. On December 3, 1990, Parker entered into a "Physician–Patient Arbitration Agreement" with Eyring. On February 26, 1991, Eyring performed a left total knee replacement surgery on Parker, again with Phillips' assistance. Numerous complications arose following surgery, including a wound infection. Helen Parker died near the end of June 1991, four months after surgery and six

months after signing the arbitration agreement. Thereafter, Parker's surviving children, Beverly Buraczynski and Stanley Parker, filed suit for her wrongful death alleging medical malpractice.

The agreements[1] signed by Bridges and Parker were presented to them on a "take it or leave it basis." Had the patients refused to sign, Eyring would not have continued to treat them. The agreements are identical in all respects and require arbitration of any and all medical malpractice claims by the patient against the doctor. The provisions bind all potential parties, including the patient's spouse and heirs, on all claims for medical negligence. In return, the physician is bound by the arbitrators' malpractice decision, including any fee claims involved in the disputed treatment. Finally, the patient has an unconditional right to revoke the agreement by providing written notice to the physician within thirty (30) days of signing.

Eyring and Phillips filed motions to compel arbitration in both the Parker and Bridges malpractice actions based on the arbitration agreement. After a joint hearing, the trial court denied the motions on the grounds that the agreement was not of a type contemplated by the arbitration statute, and that it was not enforceable because it lacked sufficient consideration.

On appeal, the cases were consolidated, and the Court of Appeals reversed the judgment of the trial court. Although agreeing with the plaintiffs that the nature of the physician-patient relationship is unique and not a typical contractual relationship, the Court of Appeals concluded that the Tennessee Arbitration Act applies to arbitration agreements between physicians and patients. The Court of Appeals also found sufficient consideration to support the agreements in question. We granted this appeal to consider an important question of first impression—the enforceability of arbitration agreements between physicians and patients.

---

1. Attached to this opinion as Appendix A is a copy of an agreement identical to those signed by the patients in this case.

## ARBITRATION

### History

Arbitration was not a favored procedure by early common law courts. The effectiveness of arbitration as a swift and inexpensive alternative to litigation was severely limited by two common law rules. First, either party could revoke the arbitration agreement at any time before the rendering of the award and second, a civil action was required to enforce the award. In combination, these two rules nullified the purpose and advantages of arbitration by fostering uncertainty and forcing the successful party into expensive and time-consuming litigation. Maynard E. Pirsig, *Some Comments on Arbitration Legislation and the Uniform Act,* 10 Vand. L.Rev. 685 (1957).

Attitudes towards arbitration changed as time passed. This change was reflected in the courts by judicial decisions praising arbitration and in society by the passage of statutes embracing arbitration as an alternative forum for dispute resolution. The effectiveness of modern arbitration statutes has been measured in terms of their inclusion of provisions making agreements to arbitrate irrevocable and initiating a time-saving procedure for compelling arbitration. *See* Stanley D. Henderson, *Contractual Problems in the Enforcement of Agreements to Arbitrate Medical Malpractice,* 58 Va.L.Rev. 947, 949 (1972). The Uniform Arbitration Act, promulgated by the National Conference on Uniform State Laws in 1955, contains both provisions and has been adopted by most states. Moreover, the Act embodies a legislative policy favoring enforcement of agreements to arbitrate.

With respect to its applicability to physician-patient arbitration agreements, the terms of the Uniform Act are general, and it does not specify particular types of agreements. As a result, several states have adopted separate statutes which specifically govern arbitration agreements between a patient and a health care provider.[2]

---

2. *See* Ala.Code Ann. § 6–5–485 (1993); Alaska Stat. § 09.55.535(a) (1994); Cal.Civ.Proc.Code § 1295 (West 1982); Cal.Bus. & Prof.Code § 803.3 (1990 & Supp.1995); Colo.Rev.Stat.Ann. § 13–64–403 (1989 & Supp.1994); Conn.Gen.

Tennessee has adopted a version of the Uniform Arbitration Act. Tennessee's version, like the Uniform Act, is general in its terms and does not specifically include physician-patient agreements. Tennessee has, however, not chosen to enact a specific statute governing arbitration agreements between health care providers and patients.

■ With respect to enforcement, the Tennessee Act provides:

> A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable save upon such grounds as exist at law or in equity for the revocation of any contract....

Tenn.Code Ann. § 29–5–302(a) (Supp.1995). Accordingly, under the terms of the statute, arbitration agreements generally are enforceable unless grounds for their revocation exist in equity or in contract law.

### Argument

The patients argue that arbitration agreements between physicians and patients are void because they are against public policy. In the alternative, they contend that the arbitration agreement in this case is too broad because it purports to cover every possible controversy that arises between the doctor and his patient and does not specify any particular medical service or procedure. Independently, patient Bridges contends that the statute does not authorize retroactive arbitration agreements, but applies only to an existing or after arising controversy.

First, the defendant doctor responds that arbitration agreements between physicians and patients are not void as against public policy. He contends that *Olson v. Molzen,* 558 S.W.2d 429 (Tenn.1977), is not controlling since this case does not involve an exculpatory clause which limits liability, but involves instead an arbitration agreement specifying a forum. Second, he argues that other courts have not required arbitration agreements to be specific, but have enforced agreements which broadly cover the entire physician-patient relationship. Finally, he asserts that no court has refused to enforce an arbitration agreement which applies retroactively so long as the patient was aware of the retroactive provision.

### Analysis

#### Public Policy

■ As we examine Tennessee's version of the uniform statute to determine whether public policy should prohibit the enforcement of physician-patient arbitration agreements, we initially observe that the Legislature specifically directed that the Tennessee Arbitration Act be "construed so as to effectuate its general purpose to make uniform the law of those states which enact it." Tenn.Code Ann. § 29–5–320 (1995 Supp.). Moreover, this Court has said that although "opinions by courts of sister states construing uniform acts are not binding upon this court, we are mindful that the objective of uniformity cannot be achieved by ignoring utterances of other jurisdictions." *Holiday Inns, Inc. v. Olsen,* 692 S.W.2d 850, 853 (Tenn.1985).

It is, therefore, significant to note that no court has ever reached the broad conclusion that public policy precludes the use of private arbitration agreements in the area of medical services. Henderson, 58 Va.L.Rev. 956; *Arbitration of Medical Malpractice Claims,* 84 A.L.R.3d 375, 377 (1978 & Supp.1995).

Professor Henderson argues that public policy favors alternative dispute resolution because it is quicker, less expensive and relieves court congestion.[3] The Legislature

Stat.Ann. § 19a–17n (1986 & Supp.1995); Fla. Stat.Ann. § 766.207 (Supp.1995); Ga.Code Ann. § 9–9–62 (Supp.1994); Ill.Ann.Stat. ch. 710, para 15/1 (1992); La.Rev.Stat.Ann. § 9:4230 (1991); Md.Code Ann., Courts and Judicial Proceedings, § 3–206 (1995); N.Y.Civ.Prac.L. & R. § 3045 (1991); Ohio Rev.Code Ann. § 2711.22–23 (1992); 40 Pa.Cons.Stat.Ann. § 1301.309 (1992); S.D.Codified Laws Ann. § 21–25B–1 (1985 & Supp.1995); Tex.Rev.Civ.Stat.Ann.

§ 4590 (Supp.1995); Vt.Stat.Ann. tit. 12, § 7001 (1994); Va.Code Ann. § 8.01 (1992 & Supp. 1994).

3. As Professor Henderson notes, the same advantages to arbitration have been cited in the health provider-patient context, namely speed, lack of expense, finality of decisions and informality of procedure and rules, and some argue that arbitration actually favors the injured patient. Pro-

has, by enacting the Uniform Arbitration Act, embraced a legislative policy favoring enforcement of such agreements. Arbitration agreements do not limit liability, but instead designate a forum that is alternative to and independent of the judicial forum. Inside the judicial system, this Court has promulgated a Rule providing for court-administered alternative dispute resolution, including arbitration.

While we acknowledge the unique nature of the physician-patient relationship, we think arbitration is as advantageous in this relationship as in any other. We, therefore, join the unanimous authority from other states and conclude that arbitration agreements between physicians and patients are not per se void as against public policy.

### Breadth

█ We also disagree with the contention that the arbitration agreements are not enforceable because of the breadth of their application. The question of whether a physician-patient agreement must be limited to a specific surgery or course of treatment was considered and rejected in *Hilleary v. Garvin*, 193 Cal.App.3d 322, 238 Cal.Rptr. 247 (1987). Like the agreements in this case, the agreement in *Hilleary* provided that any dispute as to medical malpractice will be determined by submission to arbitration. The California trial court refused to compel arbitration, holding that the arbitration agreement should have specified the particular course of medical treatment to which it applied. On appeal, the *Hilleary* court rejected that notion stating:

> Here, plaintiff submitted herself to the medical group for a course of *continuing* treatment relating to complications of childbirth. As most patients, she did not enter into lengthy or detailed bargaining negotiations as might be present in other types of commercial transactions. Rather, the parties, as in the traditional doctor-patient relationship, entered into an implied-in-fact contract that defendant would

treat her condition, and in return, she would follow his prescribed treatment and pay for his services.

. . . .

> To impose upon a physician, during a continuous doctor-patient relationship, the extra burden of having to renew the arbitration agreement each time there is a variation in treatment or ailment would be impractical, and would frustrate the purpose of the statute, which is to facilitate, not emasculate, the arbitration process.

*Id.* 238 Cal.Rptr. at 250; *see also Gross v. James A. Recabaren, M.D., Inc.,* 206 Cal. App.3d 771, 253 Cal.Rptr. 820 (1988).

Though the language contained within the agreements in *Hilleary* and *Gross* was prescribed by statute, the reasoning employed by those courts is persuasive and applies with equal force in this case. We therefore conclude that the arbitration agreements are not too broad for enforcement.

█ Moreover, arbitration is not precluded in the Bridges case because the medical treatment giving rise to this dispute was rendered prior to the time she signed the arbitration agreement. The Arbitration Act, Tenn.Code Ann. § 29-5-302(a), explicitly provides that private agreements between parties to submit to arbitration "any controversy thereafter arising" are "valid, enforceable and irrevocable save upon such grounds as exist at law or in equity for the revocation of any contract...." In this case, Bridges agreed to submit to arbitration any future "controversy" arising from the previously rendered medical care. In addition, Bridges initialed the clause which applied to the previously rendered treatment and was therefore obviously aware of it. Accordingly, the retroactive clause is enforceable. *See Coon v. Nicola,* 17 Cal.App.4th 1225, 21 Cal. Rptr.2d 846, 850-51 (1993).

---

fessor Henderson observes there is presently little evidence to assess the impact of arbitration on malpractice claimants. "Though medical proponents of the system openly confess an object of

reducing amounts paid to claimants." *See* Henderson, 58 Va.L.Rev. 956, citing to the Journal of the American Medical Association.

### Adhesion

■ Although we have determined that no facial features of the agreements prevent their enforcement, our analysis is not concluded. We must examine the agreements in question to determine whether they are contracts of adhesion, and if so, whether they contain such unconscionable or oppressive terms as to render them unenforceable. Indeed, courts in other jurisdictions closely scrutinize physician-patient arbitration agreements under general contract principles to determine if such agreements are unenforceable contracts of adhesion. *See e.g. Broemmer v. Abortion Services of Phoenix Ltd.*, 173 Ariz. 148, 840 P.2d 1013 (1992); *Leong by Leong v. Kaiser Foundation Hosp.*, 71 Haw. 240, 788 P.2d 164 (1990); *Obstetrics and Gynecologists William G. Wixted, M.D., Patrick M. Flanagan, M.D., William F. Robinson, M.D. Ltd. v. Pepper*, 101 Nev. 105, 693 P.2d 1259 (1985); *Wheeler v. St. Joseph Hosp.*, 63 Cal.App.3d 345, 133 Cal.Rptr. 775 (1976).

■ An adhesion contract has been defined as "a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract." Black's Law Dictionary 40 (6th ed. 1990); *Broemmer*, 840 P.2d at 1015. Professor Henderson has observed that "the essence of an adhesion contract is that bargaining positions and leverage enable one party 'to select and control risks assumed under the contract.'" 58 Va.L.Rev. at 988. Courts generally agree that "[t]he distinctive feature of a contract of adhesion is that the weaker party has no realistic choice as to its terms." *Broemmer*, 840 P.2d at 1016; *Leong*, 788 P.2d at 168; *Pepper*, 693 P.2d at 1260; *Wheeler*, 133 Cal.Rptr. at 783.

■ Applying the foregoing principles, we conclude that the arbitration agreements in this case are contracts of adhesion. The agreements are standardized form contracts prepared by the contracting party with superior knowledge of the subject matter—the rendition of medical services. The agree-

ments, by Eyring's own admission, were offered to the patients on a 'take it or leave it' basis. Had these patients refused to sign the agreements, Eyring would not have continued rendering medical care to them. Although the patients could have refused to sign the arbitration agreements and sought out another physician in the area, that action would have terminated the physician-patient relationship (ordinarily one of trust) and interrupted the course of the patient's treatment. To make any choice would be difficult; but to choose not to sign would result in the loss of the desired service—medical treatment from *Eyring*.

■ Our conclusion that the contracts were contracts of adhesion is not, however, determinative of the contract's enforceability. Enforceability generally depends upon whether the terms of the contract are beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable. *Broemmer*, 840 P.2d at 1016. Courts will not enforce adhesion contracts which are oppressive to the weaker party or which serve to limit the obligations and liability of the stronger party. *Id.*

For example, in the context of arbitration agreements between patients and health care providers, courts have refused to enforce an arbitration agreement which was contained within a clinic admission form and which gave the patient no option to revoke the agreement and regain the right to a jury trial. *Pepper*, 693 P.2d at 1260. Likewise, in *Beynon v. Garden Grove Medical Group*, 100 Cal.App.3d 698, 161 Cal.Rptr. 146, 150 (1980), the court refused to enforce a provision in a group health insurance plan which gave the health care provider the unilateral right to reject an arbitrator's decision without cause and to require another arbitration before a panel of three physicians. The *Beynon* court noted that the insured was unaware of the provision and the provision was unduly oppressive because the insured was required to pay one-half the costs of both arbitrations. Finally, in *Broemmer*, the court refused to enforce an arbitration agreement which was contained in a clinic admission form and which required the arbitrators to be physi-

cians specializing in obstetrics and gynecology. *Id.* at 1016.

■ An overview of these cases demonstrates that, in general, courts are reluctant to enforce arbitration agreements between patients and health care providers when the agreements are hidden within other types of contracts and do not afford the patients an opportunity to question the terms or purpose of the agreement. This is so particularly when the agreements require the patient to choose between forever waiving the right to a trial by jury or foregoing necessary medical treatment, and when the agreements give the health care provider an unequal advantage in the arbitration process itself.

■ Our examination of the arbitration agreements at issue in this case reveals none of those oppressive provisions. The agreements were not contained within a clinic or hospital admission contract, but are separate, one page documents each entitled "Physician–Patient Arbitration Agreement." A short explanation was attached to each document which encouraged the patient to discuss questions about the agreement with Eyring. The arbitration procedure specified by the agreements gives no unfair advantage to Eyring. Each side chooses an arbitrator, and the two arbitrators chosen appoint the third arbitrator. Eyring is bound by the arbitrators' decision, and any claim he has for payment of fees is subject to arbitration when a medical malpractice action is asserted. The patient is clearly informed by a provision in ten-point capital letter red type, directly above the signature line, that "by signing this contract you are giving up your right to a jury or court trial" on any medical malpractice claim. The agreements contain no buried terms. All terms are laid out clearly, including Article 2 of the agreements, which binds the spouse and heirs of the

patient to the arbitration agreement.[4] The retroactive effect provision of the agreements was addressed in a distinct clause and required the patient to separately initial it, making the provision more obvious than any other portion of the agreement. Patients signing these agreements did not immediately relinquish access to the courts, but could revoke the agreements for any reason within thirty days of its execution and regain that right.[5] Finally, and perhaps most importantly, the agreements did not change the doctor's duty to use reasonable care in treating patients, nor limit liability for breach of that duty, but merely shifted the disputes to a different forum.

None of the above described provisions can be construed as unconscionable, oppressive, or outside the reasonable expectations of the parties. As such, the agreements, though contracts of adhesion, are enforceable. *See Coon, supra* (holding enforceable an arbitration agreement between a physician-patient with terms identical to the agreements in this case). Accordingly, the Court of Appeals' judgment is affirmed.[6]

### *CONCLUSION*

Having determined that arbitration agreements between physicians and patients are not per se void as against public policy and that the specific agreements at issue in this case are enforceable, we affirm in all respects the Court of Appeals' judgment and remand to the trial court for further proceedings consistent with this opinion. Costs of this appeal are taxed one-half to the plaintiffs, Beverly Buraczynski and Stanley Parker, and one-half to the plaintiff, Carolyn Bridges, for which execution may issue if necessary.

DROWOTA, REID, BIRCH, and WHITE, JJ., concur.

---

4. Other courts have upheld the binding effect of arbitration agreements on spouses and heirs. *See e.g., Gross,* 253 Cal.Rptr. at 826; *Herbert v. Superior Court,* 169 Cal.App.3d 718, 215 Cal. Rptr. 477 (1985).

5. Plaintiffs do not allege that a disability prevented them from revoking the agreement within the thirty-day period provided, so we need not decide that question. *See e.g., DiPonio v. Henry*

*Ford Hosp.,* 109 Mich.App. 243, 311 N.W.2d 754 (1981).

6. Implicit in our holding is that the Court of Appeals correctly found that the agreements were supported by adequate consideration. *See* Tenn.Code Ann. § 47–50–103 (1995); *Rodgers v. Southern Newspapers, Inc.,* 214 Tenn. 335, 379 S.W.2d 797, 800 (Tenn.1964) (mutual promises constitute ample consideration for a contract).

# APPENDIX
## PLEASE READ THIS DOCUMENT

It is called an arbitration agreement which says that in the case of a dispute you will accept arbitration as the means of settling the dispute. If you have any questions concerning this agreement please feel free to discuss this with Dr. Eyring.

## 26215

Will Print (512) 677-3700

### PHYSICIAN-PATIENT ARBITRATION AGREEMENT

**ARTICLE 1: Agreement to Arbitrate:** The parties to this agreement are Physician and Patient. It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompletely rendered, will be determined by submission to arbitration and not by a lawsuit or resort to court process except as state law provides for judicial review of arbitration proceedings. Both parties to this contract, by entering into it, are giving up their constitutional rights to have any such dispute decided in a court of law before a jury and instead are accepting the use of arbitration.

**ARTICLE 2: All Claims Must be Arbitrated:** It is the intention of the parties that this agreement bind all parties whose claims may arise out of or relate to treatment of services provided by the Physician including any spouse or heirs of the Patient and any children, whether born or unborn, at the time of the occurrence giving rise to any claim in the case of any pregnant mother The term "Patient" herein shall mean both the mother and the mother's expected child or children.

All claims for monetary damages exceeding the jurisdictional limit of the small claims court against the Physician and the Physician's partners, associates, association, corporation or partnership, and the employees, agents, and estates of any of them, must be arbitrated including, without limitation, claims for loss of consortium, wrongful death, emotional distress or punitive damages Filing of any action in any court by the Physician to collect any fee from the Patient shall not waive the right to compel arbitration of any medical malpractice claim. However, following the assertion of any claim against the Physician, any fee dispute, whether or not the subject of any existing court action shall also be resolved by arbitration.

**ARTICLE 3 Procedures and Applicable Law:** A demand for arbitration must be communicated in writing to all parties. Each party shall select an arbitrator (party arbitrator) within thirty days and a third arbitrator (neutral arbitrator) shall be selected by the arbitrators appointed by the parties within thirty days thereafter. Each party to the arbitration shall pay such party's pro-rata share of the expenses and fees of the neutral arbitrator, together with other expenses of the arbitration incurred or approved by the neutral arbitrator, not including counsel fees or witness fees, or other expenses incurred by a party for such party's own benefit.

Either party shall have the absolute right to arbitrate separately the issues of liability and damages upon written request to the neutral arbitrator.

The parties consent to the intervention and joinder in this arbitration of any person or entity which would otherwise be a proper additional party in a court action, and upon such intervention and joinder any existing court action against such additional person or entity shall be stayed pending arbitration.

It is understood by the Patient that he or she is not required to use the undersigned Physician and that there are numerous other physicians in the immediate area who are qualified to provide the same services.

**ARTICLE 4: General Provisions:** All claims based upon the same incident transaction or related circumstances shall be arbitrated in one proceeding. A claim shall be waived and forever barred if (1) on the date notice thereof is received, the claim, if asserted in a civil action, would be barred by the applicable state statute of limitations, or (2) the claimant fails to pursue the arbitration claim in accordance with the procedures prescribed herein with reasonable diligence.

**ARTICLE 5: Revocation:** This agreement may be revoked by written notice delivered to the Physician within 30 days of signature and if not revoked will govern all medical services received by the Patient.

**ARTICLE 6: Retroactive Effect:** If Patient intends this agreement to cover services rendered before the date it is signed (for example, emergency treatment) Patient should initial below.

Effective as of the date of first medical services.

_____
Patient's initials.

If any provision of this Physician-Patient Arbitration Agreement is held invalid or unenforceable, the remaining provisions shall remain in full force and shall not be affected by the invalidity of any other provision.

NOTICE: BY SIGNING THIS CONTRACT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE ARTICLE 1 OF THIS CONTRACT.

Edward J. Eyring, M.D., Ph.D.
_____
Print or Stamp Name of Physician,
Medical Group or Association Name

By: _____ _____
Physician or Duly            Date
Authorized Representative

Translated by (if applicable):

Signature                    Date

Print Name

Patient                                      Date

Print Name

Patient's Agent or                           Date
Representative

Print Name

Relationship to Patient

A signed copy of this document is to be given to the Patient. Original is to be filed in Patient's medical records.

FILED
FEB 10 1994
SUPREME COURT CLERK