IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 21, 2003 Session

## LYNN RAITERI EX REL. MARY HELEN COX v. NHC HEALTHCARE/KNOXVILLE, INC., ET AL.

**Interlocutory Appeal from the Circuit Court for Knox County**
**No. 2-791-01     Harold Wimberly, Jr., Judge**

**Filed December 30, 2003**

**No. E2003-00068-COA-R9-CV**

Lynn Raiteri, as the daughter and next friend of the late Mary Helen Cox ("Mrs. Cox"), sued NHC Healthcare/Knoxville, Inc. ("the defendant"), as well as others,[1] for the wrongful death of Mrs. Cox, whose death allegedly resulted from improper care at the defendant's nursing home. We granted the plaintiff's Tenn. R. App. P. 9 application for an interlocutory appeal in order to review the trial court's order granting the defendant's motion to compel mediation and arbitration pursuant to the dispute resolution procedures contained in the defendant's nursing home admission agreement. We reverse.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Reversed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

Richard C. May and Loring E. Justice, Knoxville, Tennessee, for the appellant, Lynn Raiteri.

Dan D. Rhea and F. Michael Fitzpatrick, Knoxville, Tennessee, for the appellees, NHC Healthcare/Knoxville, Inc. and NHC Healthcare/Knoxville, LLC.

**OPINION**

---

[1]For ease of reference, we will refer to NHC Healthcare/Knoxville, Inc., as if it were the sole defendant. The identity of the other defendants is not critical to the resolution of this appeal. We note in passing, however, that the brief filed in response to the appellant's brief reflects that it was filed on behalf of the defendant mentioned in this footnote as well as the defendant NHC Healthcare/Knoxville, LLC. We do not know the relationship between these two defendants; but it is not important to our disposition of this appeal.

I.

A.

Mrs. Cox, age 77, was admitted to St. Mary's Hospital with chest pains and other symptoms. Her husband, Charles E. Cox ("Mr. Cox"), age 75, anticipated that his wife would receive physical therapy at St. Mary's so she could regain some or all of her mobility; but apparently the hospital was not prepared to render these services to her. Since Mr. Cox was physically unable to lift and otherwise care for his wife at home, he made arrangements to admit her to the defendant's nursing home.[2] On December 20, 2000, Mr. Cox met at the nursing home with the defendant's admissions coordinator. Mrs. Cox was not present at the meeting. The admissions coordinator asked Mr. Cox to sign the nursing home's "Admission and Financial Contract" ("the admission agreement") on his wife's behalf, even though Mrs. Cox had not been diagnosed or adjudicated as mentally incompetent. He complied with her request. It was the intention of the parties that Mrs. Cox would receive physical therapy and vocational rehabilitation services at the nursing home.

Sometime shortly after his wife's admission to the defendant's facility, Mr. Cox also was admitted to the defendant's nursing home. On March 8, 2001, Mr. Cox passed away. Mrs. Cox, while still a resident at the nursing home, died on April 19, 2001. Following her mother's death, the plaintiff filed suit for Mrs. Cox's wrongful death, alleging that the negligence, abuse, neglect, and fraud of the defendant caused her mother's death. In her complaint, the plaintiff seeks compensatory and punitive damages. In response to the complaint, the defendant filed a motion seeking to compel mediation and arbitration.

B.

Before ruling on the defendant's motion, the trial court held an evidentiary hearing. The defendant's admissions coordinator was the only witness for the defendant. She testified that she met with Mr. Cox and that he read and signed the admission agreement as Mrs. Cox's "legal representative." While acknowledging that she handled some 360 admissions a year, she claimed that she remembered that Mr. Cox read the admission agreement. When asked if and how she could remember at the time of the hearing – on September 4, 2002 – that Mr. Cox had read the admission agreement some two years earlier, she responded, "I do because all of my admissions read the contract. I see to that."

It is undisputed that Mr. Cox can read. Although the admission agreement specifically defines the term "legal representative" as "anyone authorized by the [patient] to act on the [patient's]

_____

[2]When asked what her mother's condition was in late 2000, the plaintiff responded as follows:

> It was not good. The main problem was she had had a lot of illnesses that they didn't know what was wrong with her. . . . [S]he got to the point where she was so weak she could not move – well, she could move but she couldn't stand up. She wasn't mobile.

behalf," the admissions coordinator admitted that she did not receive any indication from either of the Coxes that Mr. Cox was authorized to sign on Mrs. Cox's behalf. She stated that she did not know if Mr. Cox had his wife's authorization to act on her behalf. She testified that she allowed him to sign the admission agreement simply because he was Mrs. Cox's husband. The admissions coordinator went on to testify that she believed Mrs. Cox was competent when Mr. Cox signed the admission agreement. Despite Mrs. Cox's unquestioned mental capacity, the admissions coordinator did not discuss the admission agreement with her; furthermore, she did not give Mrs. Cox a copy of that document. She stated that she did not know whether Mrs. Cox was ever made aware of the terms and conditions of the admission agreement. Significantly, the admissions coordinator acknowledged that Mrs. Cox "was capable of understanding it," *i.e.*, the admission agreement. One of her children described her as "fine mentally" and "very competent."

The admissions coordinator confirmed that Mrs. Cox would not have been admitted if Mr. Cox had refused to sign the admission agreement or had refused to assent to the terms of the dispute resolution procedures in the agreement, which provisions included one waiving Mrs. Cox's right to a jury trial. The admissions coordinator also testified that she informed Mr. Cox of his right to revoke the entire admission agreement within 30 days; however, the witness admitted that Mr. Cox could only revoke the entire agreement, not just the provisions dealing with the dispute resolution procedures. She claimed that she explained the admission agreement to Mr. Cox and encouraged him to ask questions; in response to a question, she stated that she did not tell Mr. Cox that he had the right to consult with an attorney before signing the admission agreement. The admissions coordinator also admitted that she told Mr. Cox that any claim would be settled quickly if it was handled via the dispute resolution procedures in the admission agreement.

At the evidentiary hearing, Mrs. Cox's three children[3] testified for the plaintiff. All three children stated that they believed their mother was fully competent when Mr. Cox signed the admission agreement.[4] None of Mrs. Cox's three children were aware of any document signed by Mrs. Cox or any other conduct on her part authorizing her husband to act on her behalf or to sign documents for her. The three children agreed that their mother was "sharp" mentally. It is clear from the testimony that the children considered her more mentally competent than her husband.

Contrary to the admissions coordinator's testimony that Mr. Cox was aware of what he was doing, the plaintiff testified that her stepfather "was very upset, very agitated, [and] very confused" after he signed the agreement. The plaintiff also testified that her stepfather told her that his "only choice" was to have his wife admitted to the nursing home because he was physically unable to take care of her. Sandra Nelson, the plaintiff's sister, also testified that she saw Mr. Cox after he signed the admission agreement and that he "was very upset," "distraught," and "was just absolutely

---

[3]Two of the children were from Mrs. Cox's earlier marriage. The third child, David Cox, is the son of Mr. and Mrs. Cox.

[4]Neither party called an expert witness to testify as to Mrs. Cox's competence, and the trial court did not make a finding regarding Mrs. Cox's competency. The evidence preponderates in favor of a finding that she was competent to understand the admission agreement. *See* Tenn. R. App. P. 13(d).

bawling." David Cox also spoke to his father that day and confirmed that his father was crying and upset about his inability to care for his wife and the necessity for admitting her to a nursing home.

Ms. Nelson pointed out that she had to admit her stepfather to the nursing home soon after he had signed the admission agreement for his wife. At the time of his admission, he was diagnosed with "pneumonia, malnutrition, dehydration, and [high blood sugar]." Ms. Nelson also met with the admissions coordinator, who told Ms. Nelson that she could legally sign for her stepfather, even though Ms. Nelson did not have explicit authority to do so. Only after Ms. Nelson signed the admission agreement did the admissions coordinator arrange to have powers of attorney executed by the Coxes so Ms. Nelson could act on behalf of her mother and stepfather.

Ms. Nelson testified that, when she commented that reading the admission agreement would take a long time, the admissions coordinator said "That's quite all right. I will explain [the admission agreement] to you." Despite the admissions coordinator's assurances, Ms. Nelson claimed that the admissions coordinator never mentioned mediation or arbitration or pointed out to her that, by signing the document, she was waiving Mr. Cox's right to a jury trial. Instead, Ms. Nelson claimed that the admissions coordinator gave one sentence explanations while quickly flipping through the document.

C.

The admission agreement was admitted into evidence. The dispute resolution procedures read as follows:

> **DISPUTE RESOLUTION PROCEDURE:**
>
> **1. Initial Grievance Procedure:**[5] The parties agree to follow the Grievance procedure described in the Patient Rights Booklet for any claims or disputes arising out of or in connection with the care rendered to Patient by Center and/or its employees. Patient should know that Center is prepared to mediate any concerns at any time upon patient request (paragraph 2 below)
>
> **2. MEDIATION:** In the event there is a dispute and/or disputes arising out of or relating to (i) this contract or the breach thereof or any tort claim; or (ii) whether or not there had been a violation of any right or rights granted under state law, and the parties are unable to resolve such dispute through negotiation, then the parties agree in good faith to attempt to settle the dispute by mediation administered by the Alternative Dispute Resolution Service of the American Health Lawyers Association before resorting to arbitration. The Administrative Fee and mediator's compensation shall be paid by the center.

---

[5]This paragraph caption is not in all capital letters.

**3. ARBITRATION:** Any disputes not settled by mediation within 60 days after a mediator is appointed shall be resolved by binding arbitration administered by the Alternative Dispute Resolution Service of the American Health Lawyers Association, and judgment may be entered in any court having jurisdiction thereof. The arbitrator(s) shall be selected from a panel having experience and knowledge of the health care industry. The same person shall not serve as both the mediator and the arbitrator. The place of arbitration shall be where the Center is located, or, if that is not practical, then as close to the Center as practical. This agreement shall be governed by and interpreted in accordance with the laws of the State. The award shall be made within nine months of the commencement of the arbitration proceedings and the arbitrators shall agree to comply with this schedule before accepting appointment. However, this time limit may be extended by agreement of all the parties or by the arbitrator(s) if it is absolutely necessary, but not to exceed six months. The arbitrator(s) may award compensatory and punitive damages, and with respect to punitive damages arising under State statutes shall comply with the provisions of State statute. By agreeing to arbitration of all disputes, both parties are waiving a jury trial for all contract, tort, statutory and other claims. The award of attorneys' fees and costs of the arbitration shall be determined by the arbitrator(s) in accordance to state law. The Administrative Fee and Arbitrator's compensation shall be paid for by the center.

(Bold print and capitalization in original). Immediately following these provisions is the signature of Mr. Cox dated December 20, 2000.

The admission agreement is eleven pages long. The mediation and arbitration provisions begin at the bottom of page nine and continue on page ten. The dispute resolution procedures are printed in the same color ink, font size, and font type as the rest of the admission agreement. The mediation and arbitration provisions do not include a statement to the patient encouraging him or her to ask questions. However, as in several other areas in the admission agreement, the patient or the patient's legal representative is required to sign immediately following the text, in addition to his or her signature at the end of the document.

The arbitration provisions do not expressly state who is responsible for choosing the arbitrator; instead, the text only states that the "arbitrator(s) shall be selected from a panel having experience and knowledge of the health care industry." The arbitration provisions state that "[b]y agreeing to arbitration of all disputes, *both parties are waiving a jury trial . . . .*" (Emphasis added).

According to the admission agreement, the term "parties" refers to the patient and/or the patient's legal representative and the defendant. As previously noted in this opinion, the term "legal representative" is defined in the admission agreement as "anyone authorized by the [patient] to act on the [patient's] behalf." The dispute resolution procedures do not explain in any detail how

mediation or arbitration works; however, the provisions do explain where the process will occur and who will administer it. In the event of mediation or arbitration, the defendant is required to pay the fees associated with the process.

D.

Following the evidentiary hearing, the trial court granted the defendant's motion to compel mediation and arbitration. In its order, the trial court did not address witness credibility; nor did it make specific findings of fact. In relevant part, the order provides as follows:

> After having considered . . . the other case involving the same type of agreement,[6] the Court feels . . . that[,] unlike the Court's previous decision which was based upon the fact that the man who signed the paper was illiterate and obviously so and was not told about the consequences of what he was signing[] even though the people undertook to tell him and explain it to him, in this particular case . . . , based upon the rulings of the Supreme Court and the law, the Court rules that arbitration is required . . . . No use to go into philosophy that the Court feels the Supreme Court has adopted, but that's my conclusion.
>
> So . . . , this obviously needs to be presented to the Court of Appeals also and we'd hope that could be done as quickly as possible so we can determine what to do on this and other cases.

The trial court subsequently granted the plaintiff's motion for an interlocutory appeal.

II.

Tennessee has adopted a version of the Uniform Arbitration Act. The Tennessee version provides, in relevant part, that "a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable save upon such grounds as exist at law or in equity for the revocation of any contract." Tenn. Code Ann. § 29-5-302(a) (2000); *see also* **Buraczynski v. Eyring**, 919 S.W.2d 314, 318 (Tenn. 1996); **Howell v. NHC Healthcare-Fort Sanders, Inc.**, 109 S.W.3d 731, 733 (Tenn. Ct. App. 2003).

The Supreme Court in **Buraczynski v. Eyring** held that arbitration agreements between physicians and their patients are "not void as against public policy, and are therefore enforceable

---

[6] Judge Wimberly was obviously referring to **Howell v. NHC/Healthcare-Fort Sanders, Inc.**, 109 S.W.3d 731 (Tenn. Ct. App. 2003), which case was pending on appeal when he decided the issue now on appeal in the instant case. In **Howell**, Judge Wimberly refused to order mediation and arbitration on the ground that the agreement was unenforceable. **Id.** at 732-33. We affirmed. **Id.** at 735. On June 30, 2003, the Tennessee Supreme Court denied the defendant's application for permission to appeal **Id.** at 731.

under the Tennessee Arbitration Act." *Id*. at 316. The High Court pointed out that "under the terms of the [Tennessee Arbitration Act], arbitration agreements generally are enforceable unless grounds for their revocation exist in equity or in contract law." *Id*. at 318. The court noted a word of caution:

> We caution, however, that such agreements may constitute contracts of adhesion which must be closely scrutinized to determine if unconscionable or oppressive terms are imposed upon the patient which prevent enforcement of the agreement.

*Id*. at 316.

After determining that no "facial features," in the arbitration agreement under discussion would prevent enforcement, the court stated that this did not end the inquiry. *Id*. The court explained what it meant by this comment:

> We must examine the agreements in question to determine whether they are contracts of adhesion, and if so, whether they contain such unconscionable or oppressive terms as to render them unenforceable.

*Id*. Alluding to cases from other jurisdictions, the court indicated that it had to decide whether "such [arbitration] agreements are *unenforceable* contracts of adhesion." *Id.* (emphasis added). Quoting directly from Black's Law Dictionary 40 (6th ed. 1990), the Supreme Court defined a contract of adhesion as

> a standardized contract form offered to consumers of goods and services on essentially a "take it or leave it" basis, without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract.

*Id*. The court noted that the "distinctive feature" of a contract of adhesion "is that the weaker party [*i.e.*, the consumer] has no realistic choice as to its terms." *Id.* (quoting ***Broemmer v. Abortion Servs. of Phoenix, Ltd.***, 173 Ariz. 148, 840 P.2d 1013, 1016 (1992)); *see also **Leong v. Kaiser Found. Hosp.***, 71 Haw. 240, 788 P.2d 164, 168 (1990); ***Wheeler v. St. Joseph Hosp.***, 63 Cal. App. 3d 345, 356, 133 Cal. Rptr. 775, 783 (1976). The Supreme Court emphasized, however, that a contract of adhesion is not automatically unenforceable. ***Eyring***, 919 S.W.2d at 320.

The court in ***Eyring*** concluded that the two identical arbitration agreements before it were contracts of adhesion. It gave its rationale for this conclusion:

> The agreements are standardized form contracts prepared by the contracting party with superior knowledge of the subject matter – the rendition of medical services. The agreements, by Eyring's own

-7-

admission, were offered to the patients on a "take it or leave it" basis. Had these patients refused to sign the agreements, Eyring would not have continued rendering medical care to them. Although the patients could have refused to sign the arbitration agreements and sought out another physician in the area, that action would have terminated the physician-patient relationship (ordinarily one of trust) and interrupted the course of the patient's treatment. To make any choice would be difficult; but to choose not to sign would result in the loss of the desired service – medical treatment from *Eyring*.

*Id*. (emphasis in original). The court next turned to the question of whether contracts of adhesion are *enforceable*, stating that

[e]nforceability generally depends upon whether the terms of the contract are beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable.

*Id*. (citation omitted). After reviewing cases from other jurisdictions, the court stated that,

in general, courts are reluctant to enforce arbitration agreements between patients and health care providers[7] when the agreements are hidden within other types of contracts and do not afford the patients an opportunity to question the terms or purpose of the agreement. This is so particularly when the agreements require the patient to choose between forever waiving the right to a trial by jury or foregoing necessary medical treatment, and when the agreements give the health care provider an unequal advantage in the arbitration process itself.

*Id*. at 321.

The Supreme Court in *Eyring* determined that the agreements before it were enforceable. *Id.* The High Court reasoned that nothing in the agreements was unconscionable, oppressive, or outside the reasonable expectations of the parties in that case. *Id.* The court mentioned the following facts as supportive of its conclusion: (1) the agreement was a "separate, one page document[] . . . entitled 'Physician-Patient Arbitration Agreement'"; (2) the agreement had an attached "short explanation" that encouraged the patient to ask questions; (3) the physician did not have an unfair advantage in the arbitration procedure; (4) the patient was clearly informed in "ten-point, capital letter red type" that "by signing this contract you are giving up your right to a jury or court trial"; (5) the terms of the agreement are clearly "laid out" and are not buried, including the

---

[7]While *Eyring* involved a medical doctor, its language is broad enough to encompass other health care providers.

term that binds the patient's spouse and heirs to the agreement; (6) a patient may revoke the agreement within 30 days and "regain" the right to a trial by jury; and (7) the arbitration agreement "merely [shifts] the disputes to a different forum," rather than limiting liability. *Id.*

In *Howell v. NHC/Healthcare – Fort Sanders, Inc.*, 109 S.W. 3d 731 (Tenn. Ct. App. 2003), we applied the holding in *Eyring* and determined that a mediation and arbitration provision contained in a nursing home's admission agreement was unenforceable. *See Howell*, 109 S.W.3d at 734-35. The husband in *Howell* executed an admission agreement for his wife before she was admitted to the defendant's nursing home. *Id.* at 732. The wife had to be placed in the nursing home quickly, and the admission agreement had to be executed before she could be admitted. *Id.* Because the patient's husband could not read, the admissions coordinator undertook to explain the terms of the agreement to him. *Id.* The estate of the patient subsequently sued the nursing home, claiming abuse and neglect, as well as "infliction of physical suffering and mental anguish." *Id.* at 731. The nursing home filed a motion to compel mediation and arbitration. *Id*. Before ruling, the trial court conducted an evidentiary hearing where the admissions coordinator, the patient's husband, and the patient's children testified. *Id*. at 732.

The trial court in *Howell,* which, as previously noted, is the same court as in the instant case, refused to order mediation or arbitration. *Id*. Its refusal was based upon its determination that the admission agreement was unenforceable because (1) the patient's husband could not read and (2) the admissions coordinator failed to explain that by signing the agreement he was waiving his wife's right to a jury trial. *Id.* at 735. We affirmed the trial court in *Howell* because the nursing home "ha[d] not demonstrated that the parties bargained over the arbitration terms, or that it [sic] was within the reasonable expectations of an ordinary person." *Id.*

We held in *Howell* that the party seeking to enforce an alternative dispute resolution agreement must show that the parties "'actually' bargained over the arbitration provision or that it was a reasonable term considering the circumstances." *Id.* at 734 (quoting *Brown v. Karemor Int'l, Inc.*, C/A No. 01A01-9807-CH-00368, 1999 WL 221799, at *3 (Tenn. Ct. App. M.S., filed April 19, 1999)).

In *Howell,* we relied upon the following facts in deciding the agreement there was not enforceable: (1) the agreement was eleven pages long and the mediation and arbitration provisions were on page ten; (2) the arbitration and mediation provisions were "'buried'" in the larger admission agreement, "[r]ather than being a stand-alone document"; (3) the arbitration and mediation provisions were printed in the same font size as the other text in the agreement; (4) "the arbitration paragraph does not adequately explain how the arbitration procedure would work, except as who would administer it"; (5) the patient had to be admitted in a nursing home "expeditiously" and the admission agreement had to be signed first; (6) the admission agreement was presented to the patient's husband on a "take-it-or-leave-it" basis; (7) the patient's husband "had no real bargaining power"; and (8) the patient's husband could not read and the nursing home representative did not "adequately" explain the provision that waived the patient's right to a jury trial. *Id*. at 734-35.

III.

The plaintiff in the instant case makes numerous arguments on appeal. She asserts that the mediation and arbitration language in the instant case is identical to the language that was declared unenforceable in *Howell*.[8] Next, she argues that the mediation and arbitration provisions in this case contain terms that the Supreme Court declared unenforceable in *Eyring*. She further argues that the agreement is not enforceable because Mr. Cox did not have authority to waive any of his wife's rights or bind her to the dispute resolution procedures. She contends that Mr. Cox did not have authority or capacity to consent to arbitration because he did not "knowingly and intelligently" waive his wife's right to a jury trial. She also argues that the admission agreement is void and unenforceable because it violates federal law prohibiting "a nursing home from taking any additional consideration apart from Medicare/Medicaid reimbursement as part of the admissions process for residence." *See* 42 U.S.C. § 1396r(c)(5)(A)(iii); 42 C.F.R. §§ 483.12(d)(3), 489.30. Lastly, she argues that the "presumption in favor of arbitration" does not apply when there is a "question of whether a valid arbitration agreement exists." We find persuasive the plaintiff's arguments that Mr. Cox did not have the express or apparent authority to sign the admission agreement for his wife and that the alternative dispute resolution provisions are otherwise unenforceable. We will address the latter of these two arguments first.

We hold that the admission agreement in the instant case is a contract of adhesion because the admissions coordinator offered it to Mr. Cox on a take-it-or-leave-it basis, *i.e.*, Mr. Cox had to sign the agreement as written or his wife would not be admitted. *See Eyring*, 919 S.W. 2d at 320. Mr. Cox, as the weaker party, was not afforded an opportunity to bargain over the terms of the agreement. He certainly had no opportunity to bargain over the mediation and arbitration provisions. He was handed a form contract, under, what was for him, very trying circumstances, *i.e.*, his need to quickly find accommodations for his ailing wife. It is clear he had two options: sign the form contract as presented to him by the defendant, thereby clearing the way for his wife's admission to the defendant's facility or refuse to sign the contract and thereafter try to make arrangements for his wife's shelter and related accommodations. This is a classic case of a contract of adhesion.

Following the teachings of *Eyring* and *Howell*, we hold that the mediation and arbitration provisions are unenforceable. In so holding, we rely upon the following facts: unlike *Eyring*, the dispute resolution procedures in this case are a part of an eleven page contract dealing with many issues, including financial arrangements and consent to care, rather than being set forth in a separate stand-alone document; the dispute resolution procedures do not contain any type of "short explanation" encouraging patients to ask questions; essential terms in the mediation and arbitration provisions are "buried" and not clearly "laid out"; there are no provisions addressing how mediation and arbitration work; most significantly, the provision waiving a patient's right to a jury trial is

---

[8]We note that "NHC Healthcare" is a part of the name of the defendant in *Howell* and also a part of the name of one of the appellees in the instant case. The agreements in both cases are eleven pages long; the alternative dispute resolution provisions are on page ten of each agreement; and neither agreement contains an explanation of how mediation and arbitration work. We suspect that we are dealing with the same contract in both cases. However, we cannot be sure because the opinion in *Howell* does not state the precise mediation and arbitration language in that case.

-10-

buried – and in no way highlighted – in the third paragraph of the mediation and arbitration provisions; the dispute resolution procedures seem to imply that the defendant alone is responsible for choosing the arbitrator; and, unlike the arbitration agreement in *Eyring*, the dispute resolution procedures before us, including the provision waiving a jury trial, are printed in the same font size, type, and color as the rest of the agreement.

As a stand-alone basis for our decision, we conclude that the evidence before us preponderates against the trial court's implicit decision that Mr. Cox had authority to sign the admission agreement on behalf of his wife. There is absolutely no evidence that he had her express authority to sign for her. We also hold that the defendant cannot rely upon the concept of apparent authority. The evidence reflects that Mrs. Cox had her mental faculties, was "sharper" than her husband, and was otherwise in a position to indicate whether she assented to the terms of these significant contract provisions. The record is also devoid of any exigent circumstances that would clothe Mr. Cox with apparent authority to bind his wife to the admission agreement, particularly the alternative dispute resolution provisions. We certainly find nothing in the record before us, either factually or legally, warranting a holding that Mr. Cox had the right to waive his wife's very valuable constitutional right to a jury trial to adjudicate her rights in this matter. As the admissions coordinator acknowledged, Mrs. Cox "was capable of understanding" the admission agreement. The admissions coordinator did not adequately explain why she did not insist upon Mrs. Cox signing the admission agreement, or, at a minimum, why she did not ask Mrs. Cox to ratify what her husband had purported to do on her behalf.

IV.

In summary, we hold that Mr. Cox did not have the actual or apparent authority to bind Mrs. Cox to the alternative dispute resolution provisions in the admission agreement. Furthermore, these provisions, especially the waiver of the right to a jury trial, are outside the reasonable expectations of a reasonable consumer, and, hence, unenforceable. Following *Eyring* and *Howell*, we hold that the trial court erred when it decreed that the mediation and arbitration terms were enforceable. Therefore, we conclude that the judgment below must be reversed.

In view of our holding, we do not find it necessary to reach the plaintiff's argument based upon her interpretation of 42 U.S.C. § 1396r(c)(5)(A)(iii) and 42 C.F.R. §§ 483.12(d)(3), 489.30.

V.

The order of the trial court granting the defendant's motion to compel mediation and arbitration pursuant to the dispute resolution procedures in the nursing home admission agreement is reversed. Costs on appeal are taxed to the appellees, NHC Healthcare/Knoxville, Inc. and NHC Healthcare/Knoxville, LLC. This case is remanded for further proceedings consistent with this opinion.

_____
CHARLES D. SUSANO, JR., JUDGE