IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
APRIL 22, 2009 Session

CORINE BROADNAX, Individually and as heir and on behalf of the Estate
of Mary Alice Johnson v. QUINCE NURSING AND REHABILITATION
CENTER, LLC, ET AL.

Direct Appeal from the Circuit Court for Shelby County
No. CT-004880-05     Rita Stotts, Judge

No. W2008-02130-COA-R3-CV - Filed August 10, 2009

The parties to a nursing home Admission Agreement dispute the enforceability of its arbitration provision. The trial court refused to enforce the arbitration provision. The nursing home appealed. For the following reasons, we reverse the decision of the circuit court and remand for entry of an order compelling arbitration.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Rebecca Adelman, Chase Pittman, Peter B. Winterburn, Memphis, TN, for Appellants

Michael C. Skouteris, Russell W. Lewis, IV, Memphis, TN, for Appellee

OPINION

# I. FACTS & PROCEDURAL HISTORY

On May 12, 2000, Mary Alice Johnson ("Decedent") was admitted to Beverly Health and Rehabilitation Center. At the time of her admission, Decedent's great-niece, Corine Broadnax, acting in her fiduciary capacity as Decedent's agent and attorney-in-fact pursuant to two Durable Powers of Attorney–one general and one for healthcare–executed an Admission Agreement ("Beverly Agreement"). Ms. Broadnax has failed to produce a copy of the Beverly Agreement; however, she maintains that it did not include an arbitration agreement.

On July 1, 2003, Beverly Health and Rehabilitation Center was purchased by Quince Nursing and Rehabilitation Center ("Appellant" or "Nursing Home"). In her affidavit, Ms. Broadnax stated that "a representative of the nursing home contacted me by telephone. . . .[and] stated that Quince Nursing and Rehabilitation had taken over the facility, and that [she] was required to sign renewal admission papers."[1] Thereafter, on Friday, October 31, 2003, at approximately 5:15 PM, Ms. Broadnax arrived at the Nursing Home to visit with Decedent. Upon arrival, Ms. Broadnax visited the nurses' station, as she claims she was instructed, to sign the forms. Ms. Broadnax testified that she signed the forms in "probably less than a minute because everywhere it was for me to sign, instead of reading I just signed." She further stated that "[a]ssuming [she] was reading the old [Beverly] [A]greement and based on the representation that the packet included standard admissions forms, I quickly signed the papers." Contained within the Admission Agreement signed by Ms. Broadnax was an Arbitration Agreement. The parties do not dispute that Ms. Broadnax signed the Arbitration Agreement or that she had authority to do so.

On September 12, 2005, Ms. Broadnax filed a Complaint in the Shelby County Circuit Court asserting numerous causes of action against Nursing Home, including breach of contract, for injuries allegedly caused by deficient care rendered by Nursing Home. In response, Nursing Home filed a Motion to Compel Arbitration. The Circuit Court held a hearing on Nursing Home's motion, but reserved ruling in order to hold an evidentiary hearing and to hear testimony about "what [Ms. Broadnax] knew and when she knew it[.]" On August 20, 2008, the trial court entered an Order Denying Motion to Compel Arbitration. The trial court found as follows:

1. Defendants left paperwork, including an admissions agreement containing the arbitration agreement at issue, at the nursing station for Plaintiff to Sign;
2. Defendants did not go through the paperwork with Plaintiff, did not explain the paperwork to Plaintiff, or inform her of what she was signing; and

---

[1] In her deposition, Ms. Broadnax discussed a different situation that she claims gave rise to her signing the Admission Agreement and Arbitration Agreement. She stated that at some point Decedent was transferred from Nursing Home to the hospital. After her release from the hospital, Decedent returned to the Nursing Home. Ms. Broadnax claims that a representative of the Nursing Home telephoned her stating that Decedent had been at the hospital "longer than they would hold a bed for her[,]" and therefore Decedent had to be "readmit[ted.]" Whatever the circumstances surrounding Decedent's hospital stay, it is clear that Decedent's re-admission was not preconditioned on the signing of the Admission Agreement. Instead, Decedent was readmitted to Nursing Home prior to Ms. Broadnax signing the Admission Agreement and Arbitration Agreement at issue.

3. Defendants' failure to present the arbitration agreement to Plaintiff resulted in Plaintiff not knowing and understanding the consequences of signing such.

The Court has undertaken an exhaustive review of Tennessee law in this area and is of the opinion that the facts of this case do not warrant the enforcement of an arbitration agreement. From the foregoing findings of fact, the Court concludes there was no meeting of the minds between the parties as to whether claims on behalf of [Decedent] should be subject to arbitration.

Nursing Home appeals from that order.

## II. ISSUES PRESENTED

Appellant has timely filed its notice of appeal and presents the following issue for review, summarized as follows:

1.      Whether the trial court erred in denying Appellant's Motion to Compel Arbitration:

a. by applying a subjective "meeting of the minds" standard rather than an objective standard to determine mutual assent to the contract;

b. by failing to rule that Appellee was estopped to deny the Arbitration Agreement contained in the Admission Agreement after she failed to read it and sued for breach of that contract;

c. by implicitly ruling that Tennessee imposes an affirmative duty on a nursing facility to explain the terms of an Arbitration Agreement before the parties thereto sign the same; and

d. by violating the Federal Arbitration Act by imposing additional requirements upon the Arbitration Agreement not generally imposed upon all contracts.

For the following reasons, we reverse the decision of the circuit court and remand for entry of an order compelling arbitration.

## III. STANDARD OF REVIEW

On appeal, this Court reviews a grant or denial of a motion to compel arbitration under the same standards that apply to bench trials. *Cabany v. Mayfield Rehab. & Special Care Ctr.*, No. M2006-00594-COA-R3-CV, 2007 WL 3445550, at *3 (Tenn. Ct. App. Nov. 15, 2007); *Hubert v. Turnberry Homes, LLC*, No. M2005-00955-COA-R3-CV, 2006 WL 2843449, at *2 (Tenn. Ct. App. Oct. 4, 2006). A trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2008); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate

against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. ***Watson v. Watson***, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the trial court makes no specific findings of fact, we review the record to determine where the preponderance of the evidence lies. ***Ganzevoort v. Russell***, 949 S.W.2d 293, 296 (Tenn. 1997) (citing *Kemp v. Thurmond*, 521 S.W.2d 806, 808 (Tenn. 1975)). We accord great deference to a trial court's determinations on matters of witness credibility and will not re-evaluate such determinations absent clear and convincing evidence to the contrary. ***Wells v. Tenn. Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999) (citations omitted). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

### A. Subjective v. Objective Standard

On appeal, Appellant asserts that the circuit court erred in applying a subjective "meeting of the minds" standard, rather than the objective "reasonable person" test for mutual assent. We agree.

"It is well established in Tennessee that, in order to be enforceable, a contract must represent mutual assent to its terms, be supported by sufficient consideration, be free from fraud and undue influence, be sufficiently definite, and must not be contrary to public policy." ***T.R. Mills Contractors, Inc. v. WRH Enters., LLC***, 93 S.W.3d 861, 865 (Tenn. Ct. App. 2002) (citing *Johnson v. Cent. Nat'l Ins. Co.*, 356 S.W.2d 277, 281 (Tenn. 1962)). Mutual assent to be bound by the contract is critical. ***Id.*** at 866. To determine the mutuality of assent, "courts use an objective standard based on the manifestations of the parties." ***Id.*** (citing 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 30:6 (4th ed. 1999)). "In other words, we must determine whether a reasonable onlooker, based upon the parties' outward manifestations, would conclude that [the parties] agreed to be bound by the terms of the written contract." ***Moody Realty Co., Inc. v. Huestis***, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007) (citing *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2005)).

This Court recently criticized the "meeting of the minds" standard as misleading for its association with subjectivity. ***Rode Oil Co., Inc v. Lamar Adver. Co.***, No. W2007-02017-COA-R3-CV, 2008 WL 4367300, at *8 n.12 (Tenn. Ct. App. 2008) (citing *Colfax Envelope Corp. v. Local No. 458-3M*, 20 F.3d 750, 752 (7th Cir. 1994)) ("It is often said that a contract requires a 'meeting of the minds,' but that phrase is now widely recognized as misleading."). Furthermore, in ***Robert J. Denley Co., Inc. v. Neal Smith Constr. Co., Inc.***, No. W2006-00629-COA-R3-CV, 2007 WL 1153121, at *4 (Tenn. Ct. App. Apr. 19, 2007), we explained

Although we agree that mutual assent is essential to the formation of a contract, mutual assent is gathered from the language of the contract rather than the unexpressed or undisclosed intentions of the parties. *Gates, Duncan & Vancamp Co. v. Levatino,* 962 S.W.2d 21, 25 (Tenn. Ct. App. 1997). "The law conclusively presumes that the parties to a contract understood its obligations, and evidence is not admissible to show that their understanding was in fact otherwise." *Id.*

In response to Nursing Home's argument that the trial court erred in applying a subjective, rather than an objective, standard, Ms. Broadnax contends that the trial court did not, in fact, apply a subjective standard, and she argues that "the meeting of the minds language referenced by Appellant [from the trial court's order] is superfluous." However, she then goes on to argue that there was no meeting of the minds in this case as "Appellee believed that she was signing readmission papers identical to those she had previously signed which did not contain an arbitration agreement."

As we noted above, the trial court, in its order, found as follows:

1. Defendants left paperwork, including an admissions agreement containing the arbitration agreement at issue, at the nursing station for Plaintiff to Sign;

2. Defendants did not go through the paperwork with Plaintiff, did not explain the paperwork to Plaintiff, or inform her of what she was signing; and

3. Defendants' failure to present the arbitration agreement to Plaintiff resulted in Plaintiff not knowing and understanding the consequences of signing such.

The Court has undertaken an exhaustive review of Tennessee law in this area and is of the opinion that the facts of this case do not warrant the enforcement of an arbitration agreement. From the foregoing findings of fact, the Court concludes there was no meeting of the minds between the parties as to whether claims on behalf of [Decedent] should be subject to arbitration.

From the foregoing language, it appears that the trial court applied a subjective meeting of the minds standard to determine whether the parties mutually assented to be bound by the Arbitration Agreement contained within the Admission Agreement. Such application was in error.

### B.     Legal Effect of Ms. Broadnax's Signature

Having found that the trial court erred in applying a subjective, rather than an objective, standard to ascertain mutuality of assent, we must determine whether, using the correct standard, Tennessee law deems Ms. Broadnax to have assented to the Arbitration Agreement.

We begin with a description of the Admission Agreement and Arbitration Agreement, as well as a discussion of the circumstances surrounding their execution. The Admission Agreement consisted of nineteen pages, including a cover sheet and a table of contents. Attached to the Admission Agreement were five appendices and four exhibits, totaling eighteen pages. Exhibit B was titled "**RESIDENT AND FACILITY ARBITRATION AGREEMENT**" and consisted of two pages. Each of the topics covered in the Arbitration Agreement, as well as the title of each of the appendices and exhibits, was listed in the table of contents.

The Arbitration Agreement provides, in part:

It is understood and agreed by the Facility and the Resident that any and all claims, disputes, and controversies (hereafter collectively referred to as a "claim" or collectively as "claims") arising out of, or in connection with, or relating in any way to the Admission Agreement or any service or health care provided by the Facility to the Resident shall be resolved exclusively by binding arbitration to be conducted at a place agreed upon by the Parties, or in the absence of such an agreement, at the Facility, in accordance with the National Arbitration Forum Code of Procedure, which is hereby incorporated into this Agreement. This Agreement shall be governed by and interpreted under the Federal Arbitration Act, 9 U.S.C. Sections 1-6.

. . . .

The parties understand and agree that this contract contains a binding arbitration provision which may be enforced by the parties, and that by entering into this arbitration agreement, the parties are giving up and waiving their constitutional right to have any claim decided in a court of law before a judge and a jury, as well as any appeal from a decision or award of damages.

The Resident understands that: (a) he/she has the right to seek legal counsel concerning this Arbitration Agreement; (b) execution of this Agreement is not a precondition to admission or to the furnishing of services to the Resident by the Facility; and (c) this Agreement may be rescinded by written notice to the Facility from the Resident within thirty days of signature.

The undersigned certifies that he/she read this Agreement, that it has been fully explained to him/her, that he/she understands its contents, that he/she has received a copy of the provision and that he/she is the Resident, or a person duly authorized by the Resident or otherwise to execute this Agreement and accept its terms.

Ms. Broadnax signed her name as Decedent's designated representative at the end of the two-page Arbitration Agreement.

In her deposition, Ms. Broadnax stated that she arrived at the Nursing Home at approximately 5:15 on the afternoon of Friday, October 31, 2003, to visit Decedent. She stopped at the nurses' station to sign certain documents, as she claims she was requested to do in a telephone conversation. Ms. Broadnax testified that nurses were present at the nurses' station, and that she "knew them all by face." She then stated that she signed all of the papers in the Admission Agreement, seven signatures total,[2] in "probably less than a minute because everywhere it was for me to sign, instead of reading I just signed." Furthermore, in her affidavit, she stated that "[a]ssuming [she] was re-newing the old agreement and based on the representation that the packet included standard admission forms, I quickly signed the papers." Ms. Broadnax claimed that the "old [Beverly] [A]greement" did not contain an arbitration agreement. Although Ms. Broadnax has no copy of the Beverly Agreement, she contends that she knows it did not contain an arbitration agreement because "[i]t's something that I wouldn't sign." Ms. Broadnax testified that nothing prevented her from reading over the documents at issue.

After signing the documents, Ms. Broadnax visited with Decedent for "a half-hour to a[n] hour[.]" Ms. Broadnax answered "No" when asked if she was "under any kind of pressing obligation . . . to leave the nursing home at a particular time after [she] finished signing the papers and visiting with [Decedent.]" She also answered "No" when asked if she tried to find a nurse, an administrator, or social worker "to read through the papers and explain them to [her]," although she admitted that nothing prevented her from doing so. Although Ms. Broadnax's affidavit stated that she "was never given a copy of the ADR Agreement to take home so that [she] could review it without any time constraints[,]" she acknowledged in her deposition that she did not ask for a copy of any of the papers contained within the Admission Agreement, either on October 31, 2003, or at any time thereafter. Ms. Broadnax also failed to seek the advice of an attorney following her signing of the Admission Agreement and Arbitration Agreement, although, again, nothing prevented her from doing so.

---

[2] Ms. Broadnax signed her name as Decedent's designated representative at the end of the Admission Agreement, itself, as well as at the end of Appendix 3 (Privacy); Appendix 4 (Financial Agreement); Appendix 5 (Medicaid); Exhibit A (Benefits); Exhibit B (Arbitration); and Exhibit C (Trust Fund).

As we noted above, the parties do not dispute that Ms. Broadnax signed the Arbitration Agreement, or that she had the authority to do so. Instead, Ms. Broadnax argues that the Arbitration Agreement should not be enforced as "an arbitration agreement, unknowingly signed by one person for another, is [un]enforceable . . . in a healthcare setting." Ms. Broadnax cites two cases for her argument that, in the healthcare setting, a waiver of the right to a trial by jury must be *knowing*. Furthermore, she contends that "heavy consideration must be given to Appellee's signature being procured by Appellants' representative causing her to believe she was signing *renewal* admission papers."

In support of her argument against the Arbitration Agreement's enforcement, Ms. Broadnax first cites *Howell v. NHC Healthcare-Fort Sanders, Inc.*, 109 S.W.3d 731 (Tenn. Ct. App. 2003) *perm. app. denied* (June 30, 2003), wherein the Eastern Section of this Court affirmed the trial court's refusal to enforce an arbitration and mediation agreement. In *Howell*, a patient's husband was presented with, and signed, a nursing home admission agreement upon the patient's arrival at the nursing home. *Id.* at 732. Signing the contract was a pre-requisite to admission. *Id.* The husband could not read, and therefore, a nursing home administrator explained the agreement to him, rather than asking the husband to read it. *Id.* The administrator's "explanation did not mention, much less explain, that he was waiving a right to a jury trial[.]" *Id.* We held that "the defendant who is seeking to enforce the arbitration provision has the burden of showing the parties 'actually bargained over the arbitration provision or that it was a reasonable term considering the circumstances.'" *Id.* at 735 (quoting *Brown v. Karemor Int'l Inc.*, No. 01A01-9807-CH-00368,1999 WL 221799, at *3 (Tenn. Ct. App. Apr. 19, 1999)). We found the agreement unenforceable based upon the following facts:

> (1) the agreement was eleven pages long and the mediation and arbitration provisions were on page ten; (2) the arbitration and mediation provisions were "'buried'" in the larger admission agreement, "[r]ather than being a stand-alone document"; (3) the arbitration and mediation provisions were printed in the same font size as the other text in the agreement; (4) "the arbitration paragraph does not adequately explain how the arbitration procedure would work, except as who would administer it"; (5) the patient had to be admitted in a nursing home "expeditiously" and the admission agreement had to be signed first; (6) the admission agreement was presented to the patient's husband on a "take-it-or-leave-it" basis; (7) the patient's husband "had no real bargaining power"; and (8) the patient's husband could not read and the nursing home representative did not "adequately" explain the provision that waived the patient's right to a jury trial.

*Raiteri v. NHC Healthcare/Knoxville, Inc.*, No. E2003-00068-COA-R9-CV, 2003 WL 23094413, at *1 (Tenn. Ct. App. Dec. 30, 2003) (quoting *Howell*, 109 S.W.3d at 734-35).

Next, Ms. Broadnax cites ***Raiteri v. NHC Healthcare/Knoxville, Inc.***, No. E2003-00068-COA-R9-CV, 2003 WL 23094413, at *1 (Tenn. Ct. App. Dec. 30, 2003), in which we reversed the trial court's order granting the defendant's motion to compel mediation and arbitration pursuant to a nursing home admission agreement. In *Raiteri*, we again stated "that the party seeking to enforce an alternative dispute resolution agreement must show that the parties "'actually' bargained over the arbitration provision or that it was a reasonable term considering the circumstances." ***Id.*** at *7 (quoting *Howell*, 109 S.W.3d at 734). Finding that the "provisions, especially the waiver of the right to a jury trial"–contained within the contract of adhesion–were "outside the reasonable expectations of a reasonable consumer," we refused to enforce such. ***Id.*** at *9.

Relying on *Howell* and *Raiteri*, Ms. Broadnax asserts that "in healthcare settings . . . more than a signature on a piece of paper" is required to enforce an arbitration agreement. She seems to argue that the arbitration provision, in the instant case, was either not "bargained over" or was not "reasonable . . . considering the circumstances." ***See Howell***, 109 S.W.3d at 735.

In ***Estate of Mooring v. Kindred Nursing Ctrs.***, No. W2007-02875-COA-R3-CV, 2009 WL 130184, at *3 (Tenn. Ct. App. Jan. 20, 2009), we held that proof "'that the parties actually bargained over [an] arbitration agreement or that it was a reasonable term considering the circumstances[,] . . . has only been required in cases dealing with contracts of adhesion.'" (citation omitted); ***see also Reagan v. Kindred Healthcare Operating, Inc.***, No. M2006-02191-COA-R3-CV, 2007 WL 4523092, at *13 n.11 (Tenn. Ct. App. Dec. 20, 2007) *perm. app. denied* (Feb. 17, 2009); ***Diagnostic Ctr. v. Steven B. Stubblefield, M.D., P.C.***, 215 S.W.3d 843, 847 (Tenn. Ct. App. 2006) *perm. app. denied* (Feb. 26, 2007). A "contract of adhesion" is defined as "'a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract.'" ***Id.*** at *4 (quoting *Buraczynski v. Eyring*, 919 S.W.2d 314, 320 (Tenn. 1996)). Contracts of adhesion are not automatically unenforceable. ***Id.*** To determine the enforceability of a contract of adhesion, courts generally look to whether "the terms of the contract are beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable." ***Id.*** (citing *Taylor v. Butler*, 142 S.W.3d 277, 285 (Tenn. 2004)).

In the instant case, because the Arbitration Agreement explicitly stated that neither admission nor the furnishing of services was pre-conditioned upon signing such, and that it could be rescinded within thirty days, we find that the Arbitration Agreement was not a contract of adhesion; therefore, Nursing Home was not required to prove that the parties bargained over the terms of the Arbitration Agreement or that its terms were reasonable. Therefore, we must determine if Ms. Broadnax's signing the Arbitration Agreement, alone, evidenced her assent to be bound by its terms.

One way a party may show his or her assent to be bound by the terms of a contract is by signing the contract. ***Moody Realty Co., Inc.***, 237 S.W.3d at 674 (citing *Burton v. Warren Farmers Coop.*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002)). "A party is presumed to know the contents of a contract he has signed." ***Philpot v. Tenn. Health Mgmt. Inc.***, --- S.W.3d ----, 2007 WL 4340874, at *6 (Tenn. Ct. App. Dec. 12, 2007) *perm. app. denied* (Feb. 17, 2009) (citing *Reno v. SunTrust, Inc.*, No. E2006-01641-COA-R3-CV, 2007 WL 907256, at *3 (Tenn. Ct. App. Mar. 26, 2007); *Giles v. Allstate Ins. Co., Inc.*, 871 S.W.2d 154, 157 (Tenn. Ct. App. 1993)). "The law imparts a duty on parties to a contract to learn the contents and stipulations of a contract before signing it, and signing it without learning such information is at the party's own peril." ***Id.*** (citations omitted). "[T]o allow a party to a contract to admit that the party signed the contract but to deny that the terms of the contract express the party's agreement would destroy the value of contracts." ***Reno***, 2007 WL 907256, at *4 (citing *Giles*, 871 S.W.2d at 157); *see also Webber v. State Farm Mut. Auto Ins. Co.*, 49 S.W.3d 265, 274 (Tenn. 2001) ("'It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written.'") (quoting *De Ford v. Nat'l Life & Accident Ins. Co.*, 185 S.W.2d 617, 621 (Tenn. 1945)).

In *Giles v. Allstate Ins. Co, Inc.*, 871 S.W.2d 154 (Tenn. Ct. App. 1993), the Eastern Section of this Court considered the effect of failing to read a document before signing. In *Giles*, the plaintiff filed a complaint against her insurance company, Allstate, after Allstate failed to pay a claim. ***Id.*** at 155. In its answer, Allstate stated that it had refused to pay the plaintiff's claim because she had made material misrepresentations in her policy's application. ***Id.*** Specifically, Allstate alleged that the plaintiff failed to disclose that her former insurance carrier had paid her $100,000 for a fire just six months prior to her application with Allstate, and that her previous carrier had refused to renew her policy. ***Id.*** Plaintiff claimed when she initially contacted Allstate concerning coverage, she told Allstate's agent about the fire and the loss of coverage. ***Id.*** She further claimed that when Allstate's agent met with her in her home, he asked her the questions from the application, and she answered truthfully. ***Id.*** After answering the questions, she signed the application without reading it. ***Id.*** She was given a carbon copy of the application, but failed to read it, and thus, did not know that it contained incorrect information until after her loss occurred. ***Id.*** Although the trial court afforded credibility to the plaintiff's testimony that she revealed the information concerning the fire to Allstate's agent in the initial telephone conversation, it found that this was not controlling. ***Id.*** at 156. In affirming the trial court's denial of recovery under the policy, this Court stated:

> This same issue has been before the courts in this jurisdiction in numerous cases and they have consistently held: "[T]hat if, without being the victim of fraud [the insured] fails to read the contract or otherwise to learn its contents, he signs the same at his peril and is estopped to deny his obligation, will be conclusively presumed to know the contents of the contract, and must suffer the consequences of his own negligence."

***Id.*** (citations omitted).

-10-

On appeal, Ms. Broadnax states that Nursing Home represented to her "that the documents to be signed were identical to previously signed documents[,]" and insists that "heavy consideration must be given to Appellee's signature being procured by Appellants' representative causing her to believe she was signing *renewal* admission paperwork." We feel the need to address Ms. Broadnax's apparent claim that she was "tricked" into signing the Arbitration Agreement. Nothing in the record, other than Ms. Broadnax's own testimony, suggests that Nursing Home made false statements or representations to Ms. Broadnax concerning the terms of the Admission Agreement or Arbitration Agreement. Ms. Broadnax claims that the Beverly Agreement did not contain an arbitration agreement, and that any classification by Nursing Home of the Admission Agreement or Arbitration Agreement as a "renewal" is somehow inaccurate, misleading, or even fraudulent. Because Ms. Broadnax has failed to produce the Beverly Agreement, she cannot establish that such agreement did not contain an arbitration agreement. The only proof in the record that the Beverly Agreement did not also contain an arbitration agreement is Ms. Broadnax's deposition testimony concerning her affidavit, as follows:

> Q. At No. 5 [in your affidavit] you state that "I was presented an Admissions Agreement[, the Beverly Agreement,] which did not contain an ADR Agreement." Now, do you still have a copy today of the Admissions Agreement to which you refer in sentence No. 5?
>
> A. No.
>
> Q. Okay. Did you keep one at your house?
>
> A. I thought I did, but I couldn't find it.
>
> Q. So in paragraph 5 you say that there was no ADR agreement in that Admissions Agreement. How do you know that there was no ADR Agreement?
>
> A. It's something that I wouldn't sign.
>
> Q. So on the basis of your belief that you should not sign such an agreement, you know that you did not sign an agreement, an ADR agreement with Beverly; is that your testimony?
>
> A. Yes.

Ms. Broadnax's reasoning is obviously flawed. She claims that the Beverly Agreement did not contain an arbitration agreement, because if it had, she would not have signed it; however, the Admission Agreement at issue, which Ms. Broadnax signed, did contain an Arbitration Agreement. Thus, we find that Ms. Broadnax has failed to prove that Nursing Home misrepresented the terms

of the Admission Agreement or Arbitration Agreement, or that it perpetrated a fraud against Ms. Broadnax in procuring her signature.[3]

Based on the cases cited above, we find it inappropriate to relieve Ms. Broadnax from the operation of the Arbitration Agreement, due to her failure to read the document before signing it. In so ruling, we note that Ms. Broadnax had the ability to ask questions concerning the documents, was free to seek independent legal advice, and was given ample time to review the documents. Moreover, the Arbitration Agreement expressly stated that by signing such, Ms. Broadnax was "giving up and waiving [her] constitutional right to have any claim decided in a court of law before a judge and a jury," that execution was not a precondition to admission or the furnishing of services, and that it could be rescinded within thirty days. We further note that although the Arbitration Agreement was attached to a somewhat lengthy document, the Admission Agreement contained a table of contents, which should have drawn Ms. Broadnax's attention to the inclusion of the Arbitration Agreement, which was a separate exhibit. Because Ms. Broadnax has failed to prove that Nursing Home either misrepresented the terms of the Arbitration Agreement or acted fraudulently in inducing her to sign such, we find that Ms. Broadnax's signature evidences her assent to be bound by the Arbitration Agreement's terms.

## V.  CONCLUSION

For the aforementioned reasons, we reverse the decision of the circuit court and remand for further proceedings. Having found that the trial court erred in refusing to enforce the Arbitration Agreement, we need not consider Nursing Home's remaining issues. Costs of this appeal are taxed to Appellee, Corine Broadnax, for which execution may issue if necessary.

—————————————————————
ALAN E. HIGHERS, P.J., W.S.

---

[3] We note that the trial court made no credibility determinations concerning Ms. Broadnax or the Nursing Home.

-12-