IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 21, 2022 Session

## BUFFI LYNNE STANCIL EX REL. REBECCA MAE GENTRY v. DOMINION CROSSVILLE, LLC, ET AL.

**Appeal from the Circuit Court for Cumberland County**
**No. CC1-19-CV-6523      Jonathan L. Young, Judge**

_____

### No. E2021-01378-COA-R3-CV

_____

This is an interlocutory appeal from the trial court's decision to deny a motion to compel arbitration. For the reasons stated herein, we affirm the trial court's order.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

John B. Curtis, Jr., and Brie Allaman Stewart, Chattanooga, Tennessee, for the appellants, Kimberly Burgess Shallamer, Dominion Crossville, LLC, Dominion Group, LLC, and Dominion Senior Living, LLC.

Lane Moore, Cookeville, Tennessee, M. Chad Trammell, Texarkana, Arkansas, and Deborah Truby Riordan, Little Rock, Arkansas, for the appellee, Buffi Lynne Stancil.

## OPINION

### BACKGROUND AND PROCEDURAL HISTORY

This litigation commenced when Buffi Stancil ("Ms. Stancil"), as power of attorney and next of kin, filed suit to assert health care liability claims belonging to her mother, Rebecca Gentry ("Ms. Gentry"), a former resident at the assisted living facility Dominion Senior Living of Crossville ("Dominion Crossville"). The filed complaint averred that Dominion Crossville was "owned, operated and/or managed" by the named Defendants,[1]

---

[1] Regarding the three named corporate Defendants, the complaint averred that two were the alter egos of the third. Alternatively, the complaint alleged that agency or joint enterprise relationships existed

and it sought, among other things, punitive and compensatory damages in an amount to be determined by a jury. Because this appeal ultimately concerns the proper forum for resolving the asserted claims, as opposed to the substance of the claims themselves, we need not summarize the allegations in the complaint in any further detail.

Following the filing of the complaint, the Defendants filed a motion to compel arbitration, citing an arbitration provision that was contained within the "Assisted Living Establishment Contract" ("the Admission Contract") executed by Ms. Stancil, but not Ms. Gentry, in connection with Ms. Gentry's admission to Dominion Crossville. Although there has been a dispute among the parties over the significance of Ms. Stancil's involvement in signing the Admission Contract, Ms. Stancil, who had a durable general power of attorney and durable power of attorney for health care for her mother, executed the Admission Contract as the "Financially Responsible Party" and as "Resident's Representative."

The relied-upon arbitration provision is found on pages eight and nine of the thirteen-page Admission Contract. The formatting of the provision's heading is the same as other provision headings in the Admission Contract, and the formatting of the included text in the provision is also not distinguished relative to the text of other provisions in the Admission Contract, whether by bolded language, italics, increased font size, or otherwise. The arbitration provision states that disputes "in excess of $15,000" shall be determined by arbitration, but it does not explain what arbitration is, state how the arbitration procedures would work,[2] or communicate that agreeing to arbitration involves the waiver of a right to a jury trial. As to the last point, there is, in a *separate* succeeding provision in the Admission Contract, language stating that the parties to the Admission Contract waive the "right to a trial by jury in any action, proceeding or counterclaim," but the text of this language, like that appearing in the arbitration provision, is not presented with any distinguishing type or other emphasis relative to other text in the Admission Contract, and the provision in which it is included does not refer back to the arbitration provision.

In addition, the arbitration provision provides no opt-out option. It is not disputed on appeal that agreeing to the arbitration provision within the Admission Contract was a necessary condition for Ms. Gentry's admission to Dominion Crossville, and the arbitration provision contains no period for revocation as it concerns an agreement to arbitrate disputes. The arbitration provision concludes by stating that the arbitrator may award economic and non-economic damages,[3] that the arbitrator shall have no authority to award punitive damages, and that each side shall bear an equal share of the arbitrator's fees and

---

among them.

[2] The provision does reference the entity that would administer arbitration and further references that entity's rules and procedures.

[3] A separate provision in the Admission Contract, however, provides for a limitation on non-economic damages to an amount lower than otherwise provided by Tennessee law. *See* Tenn. Code Ann. § 29-39-102 (generally providing that such damages shall not exceed $750,000).

- 2 -

the costs of arbitration.

Ms. Gentry died during the course of litigation, and a "Suggestion of Death and Motion to Substitute Party Plaintiff" was thereafter filed with the trial court asking that the court formally "substitute the Estate of Rebecca Mae Gentry, deceased, acting by and through its Personal Representative, Buffi Lynne Stancil, as the party Plaintiff." Ms. Stancil was later substituted as the party plaintiff in her capacity as the personal representative of Ms. Gentry's estate.

The Defendants' efforts to compel arbitration prompted discovery into the events surrounding the execution of the Admission Contract and Ms. Gentry's admission to Dominion Crossville. The discovery conducted included the taking of Ms. Stancil's deposition, as well as the taking of the deposition of Kellie Dodson, a former administrator at Dominion Crossville. These depositions, along with other materials, were filed with the trial court in advance of an eventual hearing that took place on the Defendants' motion to compel arbitration.

According to Ms. Stancil, her mother had been diagnosed with dementia around 2010 and was later admitted to Fletcher House, an assisted living facility, in 2016. Ms. Stancil testified that her mother became unable to effectively communicate with her "soon after the time she went to Fletcher House." Eventually, Ms. Stancil testified, her mother's dementia got worse, causing her to on occasion wander away from the Fletcher House building. Ms. Stancil testified that this "wandering" actually occurred "two or three times," giving her concern and prompting the need to move her mother to an assisted living facility with a memory care unit that could provide care. Ms. Stancil accordingly subsequently facilitated her mother's admission to Dominion Crossville as the 2017 winter approached, and Ms. Gentry entered the facility on December 1, 2017. Elaborating on the need to move her mother to Dominion Crossville at that time, Ms. Stancil testified in relevant part as follows: "It was getting cold and my fear of her wandering outside and them not knowing where she is, because that was allowed there [at Fletcher House]. They could come and go as they wanted. So I wanted her somewhere where I knew she was safe."

Another memory care unit, Uplands, was affiliated with Fletcher House, but it had just recently been opened and was sharing an activities director with Fletcher House, which gave Ms. Stancil concern that "there wouldn't be enough activity to try to stimulate her [mother's] mind" there. Indeed, Ms. Stancil specifically stated that she was concerned "about the activities," "[o]r lack thereof."

Ms. Dodson's presence at Dominion Crossville also influenced Ms. Stancil's decision to move her mother there, as Ms. Dodson had also previously worked at Fletcher House. According to Ms. Stancil's testimony, Ms. Dodson had just started her job at Dominion Crossville. Ms. Dodson was the Executive Director at Dominion Crossville, and Ms. Stancil was comfortable with her, had considered her to be a friend, trusted her,

- 3 -

and had a lot of interaction with her when Ms. Gentry was at Fletcher House. Ms. Dodson's testimony also pointed to the closeness existing among her, Ms. Stancil, and Ms. Gentry. She stated that she had been friends with both Ms. Stancil and her mother and had originally met Ms. Gentry when Ms. Gentry had volunteered at another facility that she had worked at previously. Ms. Dodson got emotional during the course of her testimony, stating that this was "because I loved her very much, and I haven't been able to really grieve her death."

The accounts of Ms. Stancil and Ms. Dodson diverged when it came to the specifics of the events surrounding the execution of the Admission Contract. Ms. Stancil testified that she had never heard the term "arbitration" before this lawsuit started and that she signed the admission paperwork after she "got off work." She testified that it was "late" and that most of the "up front" employees at Dominion Crossville had already left. Ms. Dodson, however, was still there but allegedly "in a hurry to get out." Ms. Stancil testified that Ms. Dodson "pretty much had me sign paperwork and get out."

According to her testimony, the meeting with Ms. Dodson lasted about fifteen to twenty minutes. Ms. Stancil claimed that Ms. Dodson did not go over any of the Admission Contract, including its agreement to arbitrate, stating, "She told me she was new and it was a lot of paperwork to sign and she'd show me where to sign. And nothing was filled out. Nothing was completed." She later specifically testified that Ms. Dodson never mentioned anything about a waiver of jury trial or that the Admission Contract contained any limitations on liability.

Ms. Dodson claimed to have gone through the Admission Contract with Ms. Stancil, which Ms. Stancil asserted was a lie, but Ms. Dodson's own testimony revealed that several aspects of the arbitration provision were not explained or discussed. According to Ms. Dodson, her meeting with Ms. Stancil was in the morning, not the evening, and it was the first time she had done a permanent resident application at Dominion Crossville. She did not remember the specific words she used with Ms. Stancil regarding arbitration, but she stated that it probably would have been no more than "in some cases, if you wanted to sue Dominion Crossville, this is an agreement to arbitrate instead of going through the courts." She was not even aware at the time that arbitration was triggered by a threshold amount, nor did she discuss with Ms. Stancil the cost of arbitration. Ms. Dodson further testified that she did not know anything about JAMS,[4] which the arbitration provision references as the entity that will administer arbitration. According to her, she did not know what the applicable arbitration rules and procedures were, and she did not discuss JAMS with Ms. Stancil, nor give her a copy of its rules and procedures. Ms. Dodson's testimony indicated that she did not discuss with Ms. Stancil that punitive damages could not be awarded. Further, Ms. Dodson testified that she did not discuss the Admission Contract's monetary limitation of non-economic damages. Later in her testimony, Ms. Dodson stated that she

---

[4] The Admission Contract identifies JAMS as "formerly Judicial Arbitration and Mediation Services."

- 4 -

"didn't discuss arbitration other than to say that arbitration was something . . . they agreed to."

The trial court ultimately denied the Defendants' motion to compel arbitration and made a number of alternative rulings in its written order to support its holding. In addition to ruling that the arbitration provision was a contract of adhesion and unconscionable, the court alternatively ruled, among other things, that Ms. Stancil had not signed the Admission Contract on behalf of her mother and that "[t]he Estate of Rebecca Gentry is not bound by Buffi Stancil's signature." This appeal followed.[5]

## DISCUSSION

In their principal appellate brief, the Defendants challenge the trial court's denial of their motion to compel arbitration, raising a number of specific issues with respect to the various alternative holdings the trial court made in support of its ruling. The general standards governing our review are well-settled:

> [W]e review a grant or denial of a motion to compel arbitration under the same standards that apply to bench trials. Therefore, we will review the record *de novo* and will presume that the findings of fact are correct "unless the preponderance of the evidence is otherwise." We will review the trial court's resolution of legal issues without a presumption of correctness.

*Mitchell v. Kindred Healthcare Operating, Inc.*, 349 S.W.3d 492, 496 (Tenn. Ct. App. 2008) (internal citations omitted); *see also Cabany v. Mayfield Rehab. & Special Care Ctr.*, No. M2006-00594-COA-R3-CV, 2007 WL 3445550, at *3 (Tenn. Ct. App. Nov. 15, 2007) (noting that the "same standards that apply to bench trials" are used when reviewing the denial of a motion to compel arbitration).

As an initial matter, we observe that the trial court did not appear to specify in its order the applicable law governing the case, i.e., whether the case is governed by the Federal Arbitration Act ("FAA") or the Tennessee Uniform Arbitration Act ("TUAA"). We address the issue now at the outset of our review for clarity.

As this Court has previously explained:

---

[5] Tennessee Code Annotated section 29-5-319 provides that an interlocutory appeal may be taken from, among other orders, "[a]n order denying an application to compel arbitration." Tenn. Code Ann. § 29-5-319. This procedural provision of the Tennessee Uniform Arbitration Act applies even in cases where the underlying agreement is governed by the Federal Arbitration Act. *See SJR Ltd. P'ship v. Christie's Inc.*, No. W2013-01606-COA-R3-CV, 2014 WL 869743, at *3 (Tenn. Ct. App. Mar. 5, 2014) ("As our Supreme Court recently explained, Section 29-5-319 determines the appealability of interlocutory orders involving arbitration agreements, including agreements within the Federal Arbitration Act.").

The Federal Arbitration Act . . . "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Asplundh Tree Expert Co. v. Bates,* 71 F.3d 592, 595 (6th Cir.1995) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 937 (1983)). It mandates that arbitration clauses in commercial contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA applies to all state and federal cases in which the contract at issue requiring arbitration involves or affects interstate commerce.

*Webb v. First Tenn. Brokerage, Inc.*, No. E2012-00934-COA-R3-CV, 2013 WL 3941782, at *15 (Tenn. Ct. App. June 18, 2013).

Here, we determine that the FAA governs the arbitration provision in the Admission Contract, not the TUAA. In support of this conclusion, we observe that the arbitration provision specifically recites that the Admission Contract "evidences a transaction involving interstate commerce" and further indicates that the arbitration provision shall be governed by the "U. S. Arbitration Act." Inasmuch as the FAA applies, the arbitration provision shall, as noted above, "be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "Applicable grounds for refusing enforcement may include the defenses of laches, estoppel, waiver, fraud, duress, and unconscionability." *Webb*, 2013 WL 3941782, at *16. In this case, as we have already outlined, the trial court specifically denied the motion to compel arbitration upon concluding, among other things, that the arbitration provision was an adhesion contract and unconscionable.

We turn first to the trial court's determination that the agreement was adhesive. In discussing what constitutes an adhesion contract, the Tennessee Supreme Court has explained in relevant part as follows:

An adhesion contract has been defined as "a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract." Black's Law Dictionary 40 (6th ed. 1990); *Broemmer*, 840 P.2d at 1015. Professor Henderson has observed that "the essence of an adhesion contract is that bargaining positions and leverage enable one party 'to select and control risks assumed under the contract.'" 58 Va.L.Rev. at 988. Courts generally agree that "[t]he distinctive feature of a contract of adhesion is that the weaker party has no realistic choice as to its terms."

- 6 -

*Buraczynski v. Eyring*, 919 S.W.2d 314, 320 (Tenn. 1996).

We agree with the trial court that the arbitration provision at issue in this case constitutes an adhesion contract. Ms. Stancil and Ms. Gentry were clearly in a weaker position relative to Dominion Crossville, and it is undisputed that agreeing to the arbitration provision was a necessary condition for Ms. Gentry's admission to the facility. Ms. Stancil was concerned with her mother's placement at Fletcher House in light of Ms. Gentry's elopements, the coming winter months, and Ms. Gentry's advancing dementia, and not signing would have prevented Ms. Gentry from receiving the needed care and attention that Ms. Stancil was seeking for her. Relatedly, and as discussed in more detail *infra*, we conclude that Ms. Stancil had no realistic meaningful choice to not sign.

Our agreement with the trial court that the arbitration provision constitutes an adhesion contract is, however, not dispositive of the overall enforceability inquiry. "Enforceability generally depends upon whether the terms of the contract are beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable." *Id.* "Courts are more likely to find that contracts of adhesion are unconscionable," *Mitchell*, 349 S.W.3d at 499, and when there is an adhesion contract, the party seeking enforcement of the arbitration provision must demonstrate that the provision was bargained for or was reasonable. *Diagnostic Ctr. v. Steven B. Stubblefield, M.D., P.C.*, 215 S.W.3d 843, 847 (Tenn. Ct. App. 2006). Unconscionability is a factually-driven inquiry, and "[w]hether a particular contract is unconscionable is a question of law." *Mitchell*, 349 S.W.3d at 498-99. Procedural unconscionability may be implicated from a lack of meaningful choice by one party, and "[a] contract is substantively unconscionable when its 'terms are unreasonably harsh.'" *Id.* at 499. "Enforcement of a contract is generally refused on grounds of unconscionability where the 'inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other.'" *Taylor v. Butler*, 142 S.W.3d 277, 285 (Tenn. 2004). "Courts will not enforce adhesion contracts which are oppressive to the weaker party or which serve to limit the obligations and liability of the stronger party." *Buraczynski*, 919 S.W.2d at 320.

Past decisions from Tennessee case law provide helpful illustrations for evaluating the enforceability of adhesion contracts. For instance, in *Buraczynski*, the Tennessee Supreme Court discussed as follows when finding the adhesion contracts at issue there to be enforceable:

> Our examination of the arbitration agreements at issue in this case reveals none of th[e] oppressive provisions [which would potentially prevent enforcement]. The agreements were not contained within a clinic or hospital admission contract, but are separate, one page documents each entitled "Physician–Patient Arbitration Agreement." A short explanation was

attached to each document which encouraged the patient to discuss questions about the agreement with Eyring. The arbitration procedure specified by the agreements gives no unfair advantage to Eyring. Each side chooses an arbitrator, and the two arbitrators chosen appoint the third arbitrator. Eyring is bound by the arbitrators' decision, and any claim he has for payment of fees is subject to arbitration when a medical malpractice action is asserted. The patient is clearly informed by a provision in ten-point capital letter red type, directly above the signature line, that "by signing this contract you are giving up your right to a jury or court trial" on any medical malpractice claim. The agreements contain no buried terms. All terms are laid out clearly, including Article 2 of the agreements, which binds the spouse and heirs of the patient to the arbitration agreement. The retroactive effect provision of the agreements was addressed in a distinct clause and required the patient to separately initial it, making the provision more obvious than any other portion of the agreement. Patients signing these agreements did not immediately relinquish access to the courts, but could revoke the agreements for any reason within thirty days of its execution and regain that right. Finally, and perhaps most importantly, the agreements did not change the doctor's duty to use reasonable care in treating patients, nor limit liability for breach of that duty, but merely shifted the disputes to a different forum.

None of the above described provisions can be construed as unconscionable, oppressive, or outside the reasonable expectations of the parties. As such, the agreements, though contracts of adhesion, are enforceable.

*Id.* at 321 (internal footnotes omitted).

Of course, a different set of facts can compel a different conclusion, as is evident in this Court's decision in *Raiteri ex rel. Cox v. NHC Healthcare/Knoxville, Inc.*, No. E2003-00068-COA-R9-CV, 2003 WL 23094413 (Tenn. Ct. App. Dec. 30, 2003). In holding that the arbitration provisions at issue in the case were unenforceable, the *Raiteri* court discussed as follows:

[U]nlike [*Buraczynski*], the dispute resolution procedures in this case are a part of an eleven page contract dealing with many issues, including financial arrangements and consent to care, rather than being set forth in a separate stand-alone document; the dispute resolution procedures do not contain any type of "short explanation" encouraging patients to ask questions; essential terms in the mediation and arbitration provisions are "buried" and not clearly "laid out"; there are no provisions addressing how mediation and arbitration work; most significantly, the provision waiving a patient's right to a jury trial is buried-and in no way highlighted-in the third paragraph of the mediation

- 8 -

and arbitration provisions; the dispute resolution procedures seem to imply that the defendant alone is responsible for choosing the arbitrator; and, unlike the arbitration agreement in [*Buraczynski*], the dispute resolution procedures before us, including the provision waiving a jury trial, are printed in the same font size, type, and color as the rest of the agreement.

*Id.* at *8.

Similarly, in another decision, we held an agreement to be unenforceable where it was presented on a "take-it-or-leave-it" basis, was "not adequately explained regarding the jury trial waiver," and where the following features surrounding the arbitration clause were present:

The Agreement is eleven pages long, and the arbitration provision is on page ten. Rather than being a stand-alone document, it is "buried" within the larger document. It is written in the same size font as the rest of the agreement, and the arbitration paragraph does not adequately explain how the arbitration procedure would work, except as who would administer it.

*Howell v. NHC Healthcare-Fort Sanders, Inc.*, 109 S.W.3d 731, 734-35 (Tenn. Ct. App. 2003).

In view of these authorities, a review of the Admission Contract in this case compels the conclusion reached in *Howell* and *Raiteri*, and not the one in *Buraczynski*. As noted earlier in this Opinion, the arbitration provision at issue here was buried within the Admission Contract, appearing on pages eight and nine of the thirteen-page agreement. Moreover, as discussed earlier, the text and heading of the provision are not distinguished in any way relative to the text and headings utilized in other provisions. The same lack of emphasis, therefore, is also true of the waiver of jury language, which as it turns out, is not even included in the arbitration provision itself but is instead included in a separate provision that does not cross-reference the arbitration provision. Moreover, the arbitration provision does not explain what arbitration is, state how the arbitration procedures would work, or provide any opt-out option or period for revocation. In order to admit Ms. Gentry to Dominion Crossville, agreeing to the arbitration provision was required. We further note that, as it pertains to the execution of the Admission Contract, even accepting Ms. Dodson's account of things, it is clear that she "didn't discuss arbitration other than to say that arbitration was something . . . they agreed to." In light of all of these facts and the general principles discussed in cases such as *Howell*, *Raiteri*, and *Buraczynski*, we conclude that the arbitration provision at issue here is unenforceable.

The primary argument that the Defendants appear to pursue on appeal, both in relation to the adhesion inquiry and unconscionability inquiry, is that there was a reasonable choice to not sign the Admission Contract and that there was not any urgency

attendant to its execution. The Defendants' advancement of the notion that Ms. Gentry's placement in an assisted living memory care unit carried no urgency whatsoever fails to appreciate Ms. Stancil's concern related to her mother's past elopements from Fletcher House and that the winter months were approaching. Indeed, as outlined previously, Ms. Stancil testified as follows pertaining to the subject of her mother's admission to Dominion Crossville: "It was getting cold and my fear of her wandering outside and them not knowing where she is, because that was allowed there [at Fletcher House]. They could come and go as they wanted. So I wanted her somewhere where I knew she was safe." As for the purported availability of another reasonable option for care, the Defendants posit that the Uplands memory care facility, which was affiliated with Fletcher House, could have reasonably been chosen as well. Ms. Stancil, however, did not regard Uplands as providing the same level of care or as being sufficient for her mother's needs in light of her advancing dementia. Indeed, Ms. Gentry's advancing dementia and elopements at Fletcher House had prompted Ms. Stancil's decision to seek a different level of care, and Uplands, which was a new facility affiliated with Fletcher House, was sharing an activities director with it. As noted earlier, this gave Ms. Stancil legitimate concern that "there wouldn't be enough activity to try to stimulate her [mother's] mind" there. In light of these facts, we agree with the trial court that Ms. Stancil reasonably determined that there was no adequate alternative to Dominion Crossville to provide assisted living care for her mother and her worsening condition. The agreement had to be signed in order to obtain this care, and as noted earlier in connection with our discussion of the principles illustrated in *Howell*, *Raiteri*, and *Buraczynski*, this adhesive agreement is not enforceable.

## CONCLUSION

Based on our discussion herein, the trial court's order denying the motion to compel arbitration is hereby affirmed.[6]

 

s/ Arnold B. Goldin
ARNOLD B. GOLDIN, JUDGE

---

[6] Based on our disposition herein, we pretermit consideration of the Defendants' raised issue pertaining to the other, alternative basis upon which the trial court denied the motion to compel arbitration, that is, that Ms. Stancil's signature was not binding on her mother.

- 10 -